## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AMERICAN HOME MORTGAGE HOLDINGS, INC.,<br>a Delaware corporation, et al.,<br><br>          Debtors. | Chapter 11<br>07-11047 (CSS)<br>Jointly Administered<br><br>Adv. Pro. No. 11-51851 (CSS) |
| BARCLAYS BANK PLC and<br>BARCLAYS CAPITAL INC.,<br><br>          Appellants-Defendants,<br><br>          v.<br><br>STEVEN D. SASS, as PLAN TRUSTEE of the<br>AMERICAN HOME MORTGAGE PLAN TRUST,<br><br>          Appellee-Plaintiff. | C.A. No. 1:13-mc-00330 (LPS) |

## BARCLAYS BANK PLC AND BARCLAYS CAPITAL INC.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION PURSUANT TO 28 U.S.C. § 158(d)(2) FOR CERTIFICATION FOR DIRECT APPEAL TO THE COURT OF APPEALS FOR THE THIRD CIRCUIT

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Gregory W. Werkheiser (Del. No. 3553)
Erin R. Fay (Del. No. 5268)
1201 North Market Street
Wilmington, Delaware 19899-1347
(302) 658-9200

-and-

**LINKLATERS LLP**
Lance Croffoot-Suede
Paul S. Hessler
Titia A. Holtz
1345 Avenue of the Americas
New York, NY 10105
(212) 903-9000

Dated: January 7, 2014

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF THE FACTS ...........................................................................................3

    Procedural History .........................................................................................................3

    The Amended Complaint ...............................................................................................4

        1.   The Repurchase Agreement ...............................................................4

        2.   The Swap Agreement .........................................................................5

    Appellants' Motion to Dismiss the Amended Complaint ...............................................6

    The Bankruptcy Court's Opinion and Order ..................................................................7

QUESTIONS PRESENTED ..................................................................................................8

ARGUMENT .........................................................................................................................8

I.      LEGAL STANDARD FOR CERTIFICATION..................................................................8

II.     THE MOTION FOR CERTIFICATION SHOULD BE GRANTED .............................9

    A.    There is No Controlling Decision Regarding the Questions
          of Law Presented..................................................................................................9

    B.    This Appeal Involves a Matter of Public Importance...........................................9

    C.    The Opinion and Order Conflict with Other Decisions.....................................12

    D.    An Immediate Appeal to the Third Circuit Will Materially Advance
          the Progress of this Case ...................................................................................16

CONCLUSION ....................................................................................................................18

## TABLE OF AUTHORITIES

**Page**

### CASES

Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n (In re
Bevill, Bresler & Schulman Asset Mgmt. Corp.),
878 F.2d 742 (3d Cir. 1989) .................................................................................................12

Conn. Nat'l Bank v. Germain,
503 U.S. 249 (1992) ............................................................................................................13

Lamie v. U.S. Trustee,
540 U.S. 526 (2004) ............................................................................................................13

In re Lehman Bros. Holdings Inc.,
433 B.R. 101 (Bankr. S.D.N.Y. 2010) aff'd 445 B.R. 130 (S.D.N.Y. 2011) ..............................9

In re Lehman Bros. Inc.,
458 B.R. 134 (Bankr. S.D.N.Y. 2011) ......................................................................................9

Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.),
181 F.3d 505 (3d Cir. 1999) .................................................................................................13

Mich. State Hous. Dev. Auth. v. Lehman Bros. Deriv. Prods. Inc. (In re Lehman
Bros.), Adv. Pro. No. 09-01728 (JPM), --- B.R. --,
2013 WL 6671630 (Bankr. S.D.N.Y. Dec. 19, 2013) ..............................................................16

Patterson v. Shumate,
504 U.S. 753 (1992) ............................................................................................................13

Plassein Int'l Corp. v. B.A. Capital Co. (In re Plassein Int'l Corp.),
590 F.3d 252 (3d Cir. 2009) .................................................................................................13

In re SemCrude, L.P.,
399 B.R. 388 (Bankr. D. Del. 2009), aff'd, 428 B. R. 590 (D. Del. 2010).................................9

Simon & Schuster, Inc. v. Advanced Mktg. Servs., Inc.,
360 B.R. 429 (Bankr. D. Del. 2007).......................................................................................16

United States v. Ron Pair Enters.,
489 U.S. 235 (1989) .......................................................................................................12, 16

### STATUTES & RULES

11 U.S.C. § 362 ...........................................................................................................Passim

11 U.S.C. § 553 ................................................................................................ Passim

11 U.S.C. § 559 .............................................................................................7, 10, 14

11 U.S.C. § 560 .............................................................................................7, 10, 14

11 U.S.C. § 561 ................................................................................................ Passim

28 U.S.C. § 158 ..................................................................................................1, 8

Fed. R. Bankr. P. 8001 .............................................................................................1

## OTHER AUTHORITIES

1 Collier on Bankruptcy (15th ed. rev.)................................................................9, 10

Dennis Connolly & Kevin Hembree, The Contractual Right of Triangular Setoff in
Bankruptcy Proceedings: Issues and Alternatives, Norton Annual Survey of
Bankruptcy Law (Vol. 2013, Issue 2013), available at (Westlaw)
2013 NRTN-ASBL 1.......................................................................................11, 15

Financial Netting Improvement Act of 2006, Pub. L. No. 109-390 (2006) .............................10

H.R. Rep. No. 109-31 (2005), reprinted in 2005 U.S.C.C.A.N. 88 .........................................12

H.R. Rep. No. 101-484 (1990), reprinted in 1990 U.S.C.C.A.N. 223 .....................................12

News Release, Int'l Swaps & Derivatives Ass'n Inc., ISDA Provides Concentration
Statistics on OTC Derivatives Activity and Publishes Mid-Year 2010 Market Survey
Results (Oct. 25, 2010) available at http://www2.isda.org/attachment/MjQ3OA==/
press102510.html (last visited January 1, 2014) ....................................................................11

Pursuant to 28 U.S.C. § 158(d)(2) and Federal Rule of Bankruptcy Procedure 8001(f), Barclays Bank PLC ("BBPLC") and Barclays Capital Inc. ("Barclays Capital," and together with BBPLC, "Appellants"), by and through their undersigned counsel, respectfully submit this memorandum of law in support of their motion for certification for direct appeal to the United States Court of Appeals for the Third Circuit (the "Third Circuit"), of an opinion and order entered on November 8, 2013 by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") denying Appellants' motion to dismiss the amended complaint (together, the "Opinion and Order").[1]

## PRELIMINARY STATEMENT

In its Opinion and Order, the Bankruptcy Court determined two legal questions that control this litigation. First, the Bankruptcy Court held that a triangular set-off authorized by the parties' agreements and applicable non-bankruptcy law was nonetheless prohibited by the mutuality requirement of section 553(a) of title 11 of the United States Code (the "Bankruptcy Code"), despite the clear mandate of sections 559 through 561 of the Bankruptcy Code that such offsets "shall not be stayed, avoided, or otherwise limited by operation of any provision of [title 11] or by any order of a court . . . in any proceeding under [title 11]." E.g., 11 U.S.C. § 561(a).  Second, the Bankruptcy Court determined that Appellants' exercise of their contractual right of set-off violated the automatic stay imposed by section 362 of the Bankruptcy Code, notwithstanding the plain language of sections 362(b)(7), 362(b)(17) and 362(b)(27), which exempt such set-offs from the operation of the automatic stay.

---

[1]   Defendants timely filed a notice of appeal and a motion for leave to appeal the Opinion and Order in the Bankruptcy Court on November 22, 2013. The motion for leave to appeal and related documents were docketed with this Court on December 13, 2013.

Appellants seek certification of these questions of law for direct appeal to the Third Circuit.  Such certification should be granted for four independent reasons.  <u>First</u>, neither the Third Circuit nor the Supreme Court of the United States has addressed the issues presented.  Indeed, aside from this case, these important questions of law have been addressed to some degree only in three related decisions from the Southern District of New York, two of which were rendered by the same bankruptcy judge, arising out of the bankruptcy case of Lehman Brothers, <u>In re Lehman Brothers Holdings Inc., et al.</u>, Case No. 08-13555 (JMP).

<u>Second</u>, the questions presented by this appeal are a matter of public importance.  Congress has added, and indeed has expanded on several occasions the breadth of safe harbors to the Bankruptcy Code that protect a non-debtor's rights under certain contracts (including swap agreements, repurchase agreements and master netting agreements) from the disruptive effects of the bankruptcy of its counterparty.  Financial market participants have relied on the plain language of the Bankruptcy Code safe harbors in conducting their business.  Decisions such as the Opinion and Order and the aforementioned <u>Lehman</u> cases undermine the plain language used by Congress by engrafting a mutuality requirement – a limitation set forth in a provision of the Bankruptcy Code (section 553) – on the operation of safe harbors that expressly state that contractual rights of set-off "shall *not* be stayed, avoided, or otherwise limited by operation of any provision of [title 11]."  <u>E.g.</u>, 11 U.S.C. § 561(a) (emphasis added).  The decisions thus cause confusion and jeopardize the swift and final resolution of these protected transactions where one party thereto enters bankruptcy.  Such safe harbors are broad and clearly worded and should be interpreted in accordance with their plain language in order to provide the certainty that Congress has seen fit to protect.

Third, the Opinion and Order conflicts with well-settled law requiring courts to interpret and enforce statutes based on their plain language.  The plain language of the safe harbors at issue unequivocally provides that triangular set-offs enforceable under non-bankruptcy law, and included in protected contracts, are not subject to stay or limitation by operation of any provision of the Bankruptcy Code or by any order of a court.  The express intent of these legislative actions has been to reduce systemic risk in the banking system and financial marketplace by providing clarity and thereby avoiding volatility.  Significantly, numerous courts, including the Third Circuit, have in other cases interpreted the safe harbor provisions of the Bankruptcy Code according to their plain language to protect non-debtors, and regardless of the effect on the debtor.

Fourth, the questions of law raised by this motion largely control the course and outcome of this litigation.  The parties will not be prejudiced by an immediate appeal.  Rather, resolution of the issues of law presented will materially advance this litigation by conserving time and expense.

For each of these reasons, as further discussed below, the Request should be granted.

## STATEMENT OF FACTS

**Procedural History**

On August 6, 2007, the above-captioned Debtors, including American Home Mortgage Investment Corp. ("AHM Investment"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thus commencing the above-captioned bankruptcy cases.  On February 23, 2009, the Bankruptcy Court entered its findings of fact, conclusions of law and order [D.I. 7042] confirming the *Amended Chapter 11 Plan of Liquidation of the Debtors Dated February 18, 2009* [D.I. 7029].  According to a notice filed by the Debtors, the

3

"Effective Date" of the Plan occurred on November 30, 2010.  The Plan provided that Steven D. Sass was appointed Plan Trustee of the American Home Mortgage Plan Trust (the "Plan Trustee").

**The Amended Complaint**

On July 20, 2011, the Plan Trustee filed the *First Amended Complaint and Objection to Claims* (the "Amended Complaint") [Adv. D.I. 20].  In his Amended Complaint, the Plan Trustee brings seven causes of action and two objections to claims filed by Appellants, many of which are premised exclusively on the theory that Appellants allegedly effected a post-petition triangular set-off prohibited by section 553 of the Bankruptcy Code and in violation of the automatic stay of section 362 of the Bankruptcy Code.  The triangular set-off at issue was in respect of two contractual arrangements:  (i) a repurchase agreement entered into between Barclays Capital and AHM Investment on February 8, 2006 (the "Repurchase Agreement"); and (ii) a swap agreement entered into between BBPLC and AHM Investment on March 13, 2006 (the "Swap Agreement").

1.       **The Repurchase Agreement**

Under the Repurchase Agreement, AHM Investment, as seller, agreed to enter into transactions to transfer various securities (the "Purchased Securities") to Barclays Capital, as buyer, in exchange for funds.  Barclays Capital simultaneously agreed to return such Purchased Securities at a date certain or on demand, in exchange for repayment by AHM Investment of the principal paid for the Purchased Securities plus interest rate plus spread (the "Repurchase Price").  (Am. Compl. ¶ 14; see also id. at Ex. A).

On August 3, 2007, Barclays Capital sent AHM Investment a letter declaring an Event of Default under the Repurchase Agreement for failure to comply with the margin

maintenance provisions of the Repurchase Agreement, demanding payment of the Repurchase Price, and terminating the Repurchase Agreement.  (Id. ¶ 15; see also id. at Ex. B).  The Plan Trustee has not contested that AHM Investment was in default or that it owed the Repurchase Price, nor has he challenged the termination of the Repurchase Agreement.  (See, e.g., id. ¶ 21).

On January 11, 2008, Barclays Capital filed a proof of claim for at least $45,064,582 in deficiency that remained after termination of the Repurchase Agreement (the "Deficiency Claim").  (Id. at Ex. C).  The Plan Trustee disputes that there was any deficiency.

**2.      The Swap Agreement**

The Swap Agreement contains broad set-off provisions authorizing cross-obligation set-offs and cross-affiliate set-offs.  (Id. ¶ 34).  Specifically, the parties specifically included in the Swap Agreement the following provision:

> ***Right of Set-off.***  In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default with respect to a party . . . (in each case, "Party X"), the other party ("Party Y") will have the right (but not the obligation) without prior notice to Party X or any other person to set-off any obligation of Party X owing to Party Y or any of Party Y's Affiliates, branches or offices (whether or not arising under this Agreement, whether or not matured, whether or not contingent . . .) against any obligation of Party Y or any of Party Y's Affiliates, branches or offices owing to Party X (whether or not arising under this Agreement, whether or not matured, whether or not contingent . . .).

(Id. at Ex. E-2).  The parties agreed that this new section "shall be without prejudice and in addition to any right of set-off, combination of accounts, liens or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise)."  (Id.).

On August 2, 2007, BBPLC sent AHM Investment a letter notifying AHM Investment that it was in default (the "Swap Termination Notice").  (Id. ¶¶ 32, 43; see also id. at Ex. F).  The Swap Termination Notice designated August 2, 2007 as the termination date for all outstanding transactions under the Swap Agreement, and notified AHM Investment that BBPLC was exercising its right to set-off any amounts payable by BBPLC to AHM Investment under the Swap Agreement against AHM Investment's obligations to Barclays Capital under the Repurchase Agreement.  (Id. ¶ 43; see also id. at Ex. F).  The Plan Trustee has not contested that AHM Investment was in default; nor has he challenged the termination of the Swap Agreement.  (See, e.g., id. ¶¶ 47-49).

On January 11, 2008, BBPLC filed a proof of claim for obligations owed to BBPLC under the Swap Agreement (the "Swap Claim").  (Id. ¶ 45).  The Plan Trustee has objected to the Swap Claim, because BBPLC applied surplus collateral under the Swap Agreement (the "Swap Collateral Surplus") towards AHM Investment's obligations under the Repurchase Agreement.  (Id. ¶¶ 26, 47).  Likewise, the Plan Trustee asserts that BBPLC's set-off of the amounts payable by BBPLC to AHM Investment under the Swap Agreement against AHM Investment's unsatisfied obligations to Barclays Capital under the Repurchase Agreement breaches the Swap Agreement, violates the automatic stay, and constitutes an impermissible triangular set-off not permitted by applicable law.  (Id. ¶¶ 37, 51).

**Appellants' Motion to Dismiss the Amended Complaint**

On August 18, 2011, Appellants moved to dismiss the Amended Complaint [Adv. D.I. 26 & 27].  In their motion to dismiss, Appellants argued, among other things, that they had contractual and non-bankruptcy rights to set-off the Swap Collateral Surplus against deficiencies in the Repurchase Agreement that were protected by the safe harbor provisions of

sections 362(b)(7), 362(b)(17), 362(b)(27), and 559 through 561 of the Bankruptcy Code. The Bankruptcy Court ruled on that motion on November 8, 2013.

**The Bankruptcy Court's Opinion and Order**

The Opinion is focused almost exclusively on the interpretation of the safe harbor provisions of sections 559 through 561 of the Bankruptcy Code, and what the Bankruptcy Court determined to be their interplay with section 553, relating to set-off. Specifically, the Bankruptcy Court determined that the triangular set-off effected by Appellants by netting the Swap Collateral Surplus against obligations owing under the Repurchase Agreement was prohibited by the mutuality requirement of section 553 of the Bankruptcy Code, regardless of whether the set-off was provided for by a contractual provision enforceable under applicable non-bankruptcy law.  The Bankruptcy Court disregarded the plain language of the controlling safe harbor sections of the Bankruptcy Code that provide for the enforceability in bankruptcy of the exercise of set-off rights included in swap agreements, repurchase agreements and master netting agreements that are enforceable under applicable non-bankruptcy law, and *which expressly provide that the operation of such set-off rights shall not be stayed, avoided or otherwise limited by any provision of the Bankruptcy Code*.  See 11 U.S.C. §§ 362(b)(7), 362(b)(17), 362(b)(27), 559, 560 and 561. Instead, the Bankruptcy Court adopted a mutuality requirement for *all* set-offs exercised in a bankruptcy context – a holding which is clearly at odds with the plain language of the Bankruptcy Code's safe harbors at issue in this litigation.

Furthermore, notwithstanding the plain language of the controlling provisions of the Bankruptcy Code excepting such set-offs from operation of the automatic stay, the Bankruptcy Court concluded that Appellants exercised an improper set-off in violation of the

automatic stay on the basis of the Court's ruling that the triangular set-off was not permissible under section 553.

## QUESTIONS PRESENTED

Appellants respectfully request certification of the following questions of law for appeal directly to the Third Circuit:

1)      Is a triangular set-off provided for under the express terms of the Swap Agreement and enforceable under applicable non-bankruptcy law, permitted by the plain language of the safe harbor provisions of the Bankruptcy Code – sections 362(b)(7), 362(b)(17), 362(b)(27), 559, 560 and 561 – which protect contractual rights of parties to swap agreements, master netting agreements and repurchase agreements, notwithstanding section 553 of the Bankruptcy Code?

2)      Is a triangular set-off, provided for under the express terms of the Swap Agreement and enforceable under applicable non-bankruptcy law, permissible under the plain language of the safe harbor provisions of the Bankruptcy Code – sections 362(b)(7), 362(b)(17), 362(b)(27), 559, 560 and 561 – which protect contractual rights of parties to swap agreements, master netting agreements and repurchase agreements, notwithstanding the automatic stay?

## ARGUMENT

## I.      LEGAL STANDARD FOR CERTIFICATION

Section 158(d)(2) permits litigants to appeal directly to the circuit courts decisions of the bankruptcy courts.  See 28 U.S.C. § 158(d)(2).  Pursuant to the statute, certification of an order for direct appeal is mandatory and "shall" be granted if any one of the following circumstances is present:

(i) [T]he judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, *or* involves a matter of public importance;

(ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; *or*

(iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken.

Id. (emphasis added).  Each of these independent grounds for certification is present here.[2]

## II.      THE MOTION FOR CERTIFICATION SHOULD BE GRANTED

A.      There is No Controlling Decision Regarding the Questions of Law Presented

Certification is warranted because neither the Third Circuit nor the United States Supreme Court has addressed the questions of law presented by this motion.  Indeed, only one bankruptcy court judge in the Southern District of New York has considered the precise issues raised here.[3]  See In re Lehman Bros. Inc., 458 B.R. 134 (Bankr. S.D.N.Y. 2011).  Appellants are not aware of any other cases in which these questions have been decided by any court, nor has the Plan Trustee or the Bankruptcy Court cited any other case addressing these specific legal issues.

B.      This Appeal Involves a Matter of Public Importance

Certification is likewise warranted because the pure questions of law presented here are of great import not only to this litigation, but to the general public as well.  See 1

---

[2]  Certification is also appropriate where all parties to the appeal agree to it.  28 U.S.C. § 158(d)(2).  The Plan Trustee has not agreed to certification.

[3]  While the Bankruptcy Court relied heavily on a bankruptcy court and a district court opinion in In re Lehman Brothers Holdings Inc., 433 B.R. 101 (Bankr. S.D.N.Y. 2010) aff'd 445 B.R. 130 (S.D.N.Y. 2011), and on In re SemCrude, L.P., 399 B.R. 388 (Bankr. D. Del. 2009), aff'd, 428 B. R. 590 (D. Del. 2010), none of those decisions addressed the questions of law presented here, much less in analogous factual circumstances.

Collier on Bankruptcy 5.05[A] (15th ed. rev.) (defining matters of public importance as those that "transcend[] the litigants and involve[] a legal question the resolution of which will advance the cause of jurisprudence to a degree that is usually not the case.").

Here, the plain language of the relevant safe harbors is unambiguous and protects the types of contracts at issue from the effects of bankruptcy. Recognizing the grave effect that not doing so could have on, for example, the swap and repo markets, Congress created these safe harbors, and has expanded their breadth over time to provide non-debtor counterparties with greater protection from the adverse effects of a counterparty bankruptcy. Congress has explicitly stated that the exercise of "any contractual right" of set-off included in swap agreements, repurchase agreements and master netting agreements that are enforceable under applicable non-bankruptcy law, "shall not be stayed, avoided, *or otherwise limited by operation of any provision of [title 11]* or by any order of a court . . . in any proceeding under [title 11]." See 11 U.S.C. §§ 362(b)(7), 362(b)(17), 362(b)(27), 559, 560 and 561. Further, while the safe harbors from the automatic stay for protected contracts in sections 362(b)(7), 362(b)(17) and 362(b)(27) had referenced a mutuality requirement, such a mutuality requirement was deleted from those provisions by Congress in 2006 when it enacted the Financial Netting Improvement Act of 2006, Pub. L. No. 109-390 (2006).[4]

---

[4] For example, the 2005 version of section 362(b)(27) read as follows:

> (b) The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay— . . .

> (27) under subsection (a), of the setoff by a master netting agreement participant *of a mutual debt and claim* under or in connection with one or more master netting agreements or any contract or agreement subject to such agreements that constitutes the setoff of a claim against the debtor for any payment or other transfer of property due from the debtor under or in connection with such agreements. . . .

Decisions like the Opinion create uncertainty for the financial markets, by imposing a mutuality requirement – a limitation of "a provision of the Bankruptcy Code" (that is, section 553) – in opposition to Congress' mandate.  Market participants have relied on the plain language of the safe harbors, including those at issue, to enter into protected contracts in the belief that the operation of *any* provision of the Bankruptcy Code, including section 553, would not interfere with the contractual terms of their protected transactions.[5] This reliance has extended to, as in this case, the inclusion of triangular set-off provisions by parties to swap, repurchase and master netting agreements based on the plain language of the safe harbors addressing such contracts.  See generally Dennis Connolly & Kevin Hembree, The Contractual Right of Triangular Setoff in Bankruptcy Proceedings: Issues and Alternatives, Norton Annual Survey of Bankruptcy Law (Vol. 2013, Issue 2013), available at (Westlaw) 2013 NRTN-ASBL 1.

Accordingly, the questions presented for appeal should be certified to the Third Circuit for consideration so that the certainty Congress intended to foster by enacting the plain language of the safe harbors can be provided to the large number of participants in these important markets – markets Congress has time and again sought to protect from the upheaval bankruptcy can create.

---

11 U.S.C. 362(b)(27) (2005) (emphasis added).

[5]   The mid-year 2010 market survey of the International Swaps and Derivatives Association, Inc. reported continued growth to the swaps markets, estimated at that time to have an outstanding notional amount of $466.8 trillion.  See News Release, Int'l Swaps & Derivatives Ass'n Inc., ISDA Provides Concentration Statistics on OTC Derivatives Activity and Publishes Mid-Year 2010 Market Survey Results (Oct. 25, 2010) available at http://www2.isda.org/attachment/MjQ3OA==/press102510.html (last visited January 1, 2014).

C.     The Opinion and Order Conflict with Other Decisions

The Bankruptcy Court grafted a mutuality requirement onto set-offs that are enforceable under non-bankruptcy law and protected by the Bankruptcy Code, notwithstanding the plain language of the safe harbors at issue.  Appellants respectfully submit that the Bankruptcy Court erred in arriving at this conclusion.  The Opinion and Order conflict with controlling law regarding how statutes must be interpreted and also with how the Third Circuit has interpreted other financial contract safe harbors.

It is well-settled that the "plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result *demonstrably* at odds with the intention of the drafters."[6]  United States v. Ron Pair Enters., 489 U.S. 235, 242 (1989) (internal quotation marks omitted) (emphasis added); see also

---

[6]  Here, there is no question that a strict interpretation of the plain language of the safe harbors aligns with the drafters' intent.  Indeed, over time, Congress has revisited, expanded and clarified these safe harbors to continue to protect market participants as those markets have evolved and to provide greater protection to non-debtor counterparties.  At the center of all this legislation has been the constant desire to provide certainty and to prevent volatility:

> U.S. bankruptcy law has long accorded special treatment to transactions involving financial markets, to minimize volatility.  Because financial markets can change significantly in a matter of days, or even hours, a non-bankrupt party to ongoing securities and other financial transactions could face heavy losses unless the transactions are resolved promptly and with finality.

H.R. Rep. No. 101-484, at 2 (1990), reprinted in 1990 U.S.C.C.A.N. 223, 224.  See also Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.), 878 F.2d 742, 748 (3d Cir. 1989) ("The certainty and fluidity needed by professionals on both sides of the transactions is of such importance that one debtor's filing of a petition should not be permitted to impair the functioning of the market as a result of the Code's automatic stay, or have the integrity of contract relationships upset by the Code's avoidance provisions.").  The later amendments to the Bankruptcy Code, including safe harbors for master netting agreements, were enacted with the same purpose:  "to reduce 'systemic risk' in the banking system and financial marketplace," by "allow[ing] the expeditious termination or netting of certain types of financial transactions." H.R. Rep. No. 109-31, at 20 (2005), reprinted in 2005 U.S.C.C.A.N. 88, 105-06.

Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004) ("It is well-established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.") (internal quotation marks omitted)); Patterson v. Shumate, 504 U.S. 753, 757, 759 (1992) ("[T]he plain language of the Bankruptcy Code … is our determinant. … We must enforce the statute according to its terms."); Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) (holding that when a statute is unambiguous, an analysis of its plain meaning ends the inquiry).  The safe harbors at issue should be enforced as they are written.

Indeed, the Third Circuit has interpreted other financial contract safe harbors expansively based on their plain language.  See, e.g., Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.), 181 F.3d 505, 516 (3d Cir. 1999) (applying "settlement payment" defense of section 546(e) to insulate from avoidance certain payments and noting that "[d]espite the fact that payments to shareholders in [connection with] an LBO are not the most common securities transaction, we see no absurd result from the application of the statute's plain language and will not disregard it."); Plassein Int'l Corp. v. B.A. Capital Co. (In re Plassein Int'l Corp.), 590 F.3d 252 (3d Cir. 2009) (applying Resorts and extending coverage of section 546(e) in the context of privately held securities).  The same should be done here, which would achieve Congress' intentions to promote clarity and finality to protected transactions, thereby preventing market volatility.

The Opinion undermines the clarity of the safe harbors by erroneously reading into those provisions the terms of another provision of the Bankruptcy Code, section 553, which states that the Bankruptcy Code does not affect any right of a creditor to offset mutual debts.  11 U.S.C. § 553(a).  The Opinion asserts that in bankruptcy, the right to set-off exists

only because section 553 preserves them, and, thus, *all* set-offs must comply with the mutuality requirement.  (See, e.g., Op. at 20-25.)  But that holding does not give any weight to the phrase, "the exercise of any contractual right," as set forth in the safe harbors.  The safe harbors expressly state that "the exercise of any contractual right . . . to offset or net out any termination values, [or] payments amounts . . . shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court . . . ."[7]  11 U.S.C. § 553(a).

By using the term, "any contractual right," Congress plainly referred to set-off rights as defined by the terms of protected contracts, not as limited by section 553(a).[8]  If

---

[7]   Section 561 provides in pertinent part:

> *the exercise of a contractual right to offset or net* termination values . . . arising under or in connection with one or more (or the termination, liquidation or acceleration of one or more) . . . [swap agreements, repurchase agreements or master netting agreements] *shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by any order of a court . . . in any proceeding under this title.*

11 U.S.C. §561(a) (emphasis added).  Section 560 (with respect to "swap agreements") and section 559 (with respect to "repurchase agreements") contain similar protections (i.e., that the exercise of a "contractual right . . . *shall not be stayed, avoided or otherwise limited*.").  11 U.S.C. §§ 559, 560 (emphasis added).

Similarly, the Bankruptcy Code's exceptions to the automatic stay for safe harbored contracts permit the exercise of a "contractual right" to set-off, see 11 U.S.C. §§ 362(b)(7), 362(b)(17), 362(b)(27), and section 362(o) further provides that "[t]he exercise of rights not subject to the stay arising under subsection (a) pursuant to paragraph . . . *(7), (17), or (27) of subsection (b) shall not be stayed by any order of a court . . . in any proceeding under this title.*" 11 U.S.C. § 362(o) (emphasis added).  Again, none of these safe harbor provisions refer to mutuality or to being subject to section 553.  In fact, as mentioned above, the Financial Netting Improvement Act of 2006, enacted after section 561 was added to the Bankruptcy Code in 2005, expressly eliminated any requirement that the set-off of debts and claims referred to in sections 362(b)(7), 362(b)(17) or 362(b)(27) be mutual.

[8]   "Contractual right" is defined in section 561 to include, *inter alia*, "a right, whether or not evidenced in writing, arising under common law, under law merchant, or by reason of normal business practice."  Notably, this broad definition of "contractual right" contains no requirement of "mutuality."

Congress had intended the safe harbor rights to apply only to a subset of "contractual right[s]" (those providing a right to mutual offsets), it easily could have said so.  Instead, Congress provided that the exercise of such "contractual rights" "shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by any order of a court . . . in any proceeding under this title."  By using the unlimited and unmodified phrase "*any contractual rights*" and providing that the exercise of such rights shall not be limited by operation of *any* provision of the Bankruptcy Code, Congress plainly chose not to limit the range of "contractual right[s]" of offset that are subject to the safe harbor protections, and the Opinion renders the explicit language of the safe harbors meaningless in cases such as this one, in which a protected contract includes an enforceable right under non-bankruptcy law to triangular set-off with respect to more than one protected contract.[9]

      The holding of the Opinion is also flawed because its premise – that all set-offs are subject to the mutuality requirement of Section 553(a) – itself violates the safe harbor's direction that "any contractual right" of set-off "shall not be stayed, avoided, or otherwise limited *by operation of any provision of this title* or by order of a court . . . ."  Imposing a mutuality requirement derived from section 553(a) onto sections 559 through 561 has the exact effect of limiting *by operation of a provision of title 11 the exercise of a contractual*

---

[9] Moreover, section 553(b) refers to "*a setoff of a kind described* in section . . . 559, 560, 561 . . . of this title . . . ."  11 U.S.C.  § 553(b)(1).  That language does not modify the term "setoff" with the word "mutual," and implicitly recognizes that there are set-offs "of a kind" other than those described in section 553(a).  The 2013 Collier Pamphlet Edition of the Bankruptcy Code notes that "[s]etoffs of a kind described in [the enumerated sections] are protected from the strictures of section 553(a) or avoidance under section 553(b)."  2013 Collier Pamphlet Edition of the Bankruptcy Code, Section 553 – Relation to Other Code Sections; see also Dennis Connolly & Kevin Hembree, The Contractual Right of Triangular Setoff in Bankruptcy Proceedings: Issues and Alternatives, Norton Annual Survey of Bankruptcy Law (Vol. 2013, Issue 2013), available at (Westlaw) 2013 NRTN-ASBL 1 (criticizing the Lehman decisions, especially in light of the plain language of sections 559 through 561 of the Bankruptcy Code).

*right to offset or net* provided by a protected contract.  Such a result produces the type of confusion and market volatility that Congress intended to avoid.[10]

The safe harbors at issue, by their unambiguous terms, are *not* limited by section 553 of the Bankruptcy Code.  The Opinion conflicts with controlling law requiring the interpretation of unambiguous statutes based on their plain language.[11]  Certification should be granted.

D.   An Immediate Appeal to the Third Circuit Will Materially Advance the Progress of this Case

"The court *must* issue a certification if it determines [that a direct appeal] *may* materially advance the progress of the case or proceeding in which the appeal is taken."  Simon & Schuster, Inc. v. Advanced Mktg. Servs., Inc., 360 B.R. 429, 433 (Bankr. D. Del. 2007) (emphasis added).  The fact that resolution of this appeal would not necessarily

---

[10] Notably, Judge Peck, who decided the Lehman cases upon which the Opinion relies, recently issued a decision enforcing a strict reading of section 560 of the Bankruptcy Code, and concluding that the contract at issue and the right and means to liquidate it were protected.  Mich. State Hous. Dev. Auth. v. Lehman Bros. Deriv. Prods. Inc. (In re Lehman Bros.), Adv. Pro. No. 09-01728 (JPM), --- B.R. ----, 2013 WL 6671630 (Bankr. S.D.N.Y. Dec. 19, 2013).  In the context of the effect of an *ipso facto* clause on the protected right of liquidation, Judge Peck noted the primacy of the plain language of the statute and emphasized that his ruling "promotes the systemic goals of the safe harbor – to provide stability and certainty to the markets upon the insolvency of a counterparty" and avoids "the delay, expense and uncertainty that results when there is doubt surrounding the enforceability of contractual terms."  Id. at *8.

[11] Both the Opinion and the cases upon which it relies refer to bankruptcy policy to support the imposition of a mutuality requirement on, for example, sections 559 through 561; namely that requiring mutuality for purposes of set-off ensures the equitable treatment of creditors.  (See Op. at 25.)  But the Bankruptcy Code already recognizes instances of favorable treatment to certain creditors (e.g., government, secured creditors, administrative expense creditors).  And in any event, courts must look to the plain language of a statute, even when determining the balance Congress intended to strike among competing policy objectives.  See, e.g., Ron Pair Enters., 489 U.S. at 245-46 ("the payment of postpetition interest is arguably somewhat in tension with the desirability of paying all creditors as uniformly as practicable" but "Congress expressly chose to create that alleged tension. There is no reason to suspect that Congress did not mean what the language of the statute says.").

determine all the issues in this proceeding, does not dictate whether certification should be granted.[12]  See, e.g., Order at 4, n.2, In re Nat'l Gas Distribs., LLC v. Smithfield Packing Co. (In re Nat'l Gas Distribs., LLC), No. 5:07-MC-30 (E.D.N.C. Sept. 12, 2007) (certifying issues for appeal even though other claims may remain pending against defendant) (Exhibit A hereto).

In the Amended Complaint, the Plan Trustee brings a series of alternate claims for the same damages.  This appeal will materially advance the progress of this litigation by resolving many of these claims, thereby focusing the scope of the litigation, and conserving the resources of both the parties and the Court.

Moreover, the parties will not be prejudiced by an immediate appeal.  The original complaint was not filed in this action until more than three years after Appellants had timely filed their proofs of claim.  Discovery has not yet commenced, even though there has never been a stay of the proceedings.

Finally, a trial on the merits would be costly and time-consuming to litigate, and should not precede the determination of the issues presented by this appeal.  To proceed otherwise risks the possibility of having to revisit liability questions and claim amounts following a later appeal.  And the legal issues surrounding the relationship, if any, between (i) the safe harbors set forth in sections 559 through 561; and (ii) the mutuality requirements of section 553 and the automatic stay imposed by section 362, are of such importance that certification should be granted, so that the Third Circuit can consider these important issues in

---

[12]  Resolution of the appeal may not resolve certain valuation issues (though it is indisputable that Barclays Capital has the sole discretion under the Repurchase Agreement, as the non-defaulting party, to value the securities comprising the Deficiency Claim).  (Am. Compl., Exhibit A, ¶¶ 11(a), 11(d)).  Nonetheless, (i) answers to the questions presented here will materially advance the case; and (ii) the issues presented are live threshold questions of law.

accordance with Congress' purpose behind enacting these safe harbors.  Accordingly, because of the importance of the questions of law presented, and their impact on the scope of this litigation, certification of these issues now is the most efficient course of action for this litigation.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that the Court certify for direct appeal to the Third Circuit the Bankruptcy Court's Opinion and Order dated November 8, 2013, and grant such other and further relief as the Court deems necessary or proper.

Dated:   January 7, 2014               MORRIS, NICHOLS, ARSHT & TUNNELL LLP
          Wilmington, Delaware

*/s/ Gregory W. Werkheiser*

By:   Gregory W. Werkheiser (Del. No. 3553)
Erin R. Fay (Del. No. 5268)
1201 North Market Street
Wilmington, Delaware 19899-1347
(302) 658-9200
Email: gwerkheiser@mnat.com
        efay@mnat.com

- and -

Lance Croffoot-Suede
Paul S. Hessler
Titia A. Holtz
LINKLATERS LLP
1345 Avenue of the Americas
New York, NY 10105
(212) 903-9000
(212) 903-9100 (fax)

*Attorneys for Appellants-Defendants Barclays Bank PLC and Barclays Capital Inc.*